# FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DEC 0 8 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**FADY KASSEM**
**5230 Walton Street**
**Long Beach, CA 90815**

          **Plaintiff,**

     **v.**

**WASHINGTON HOSPITAL**
**CENTER**
**110 Irving Street, N.W.**
**Washington, D.C. 20010-2975**

**Serve:**
    **CT Corporation**
    **1015 Fifteenth Street, N.W.**
    **Suite 1000**
    **Washington, D.C. 20005**

         **Defendant.**

**CASE NO.:** _____

CASE NUMBER 1:05CV02352

JUDGE: James Robertson

DECK TYPE: Contract

DATE STAMP: 12/08/2005

JURY ACTION

## COMPLAINT
### (Jury Trial Demanded)

COMES NOW, plaintiff Fady Kassem, by and through undersigned counsel, and for his cause of action alleges as follows:

1.    This is an action for damages in excess of Seventy-five Thousand Dollars ($75,000), exclusive of interest and costs, for equitable relief, and for such other relief that may be within the jurisdiction of the Court.

2.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship and the claim exceeds the jurisdictional amount.

3.    Plaintiff Fady Kassem is a resident of the State of California.

*1*

4.      Defendant Washington Hospital Center is a corporation doing business as a health care provider in the District of Columbia.

5.      The acts complained of herein occurred in the District of Columbia and elsewhere.

6.      Venue is proper in this district under 28 U.S.C. § 1391.

7.      On or about July 26, 2001, plaintiff Kassem was contacted about a position at Washington Hospital Center, an H1-B work visa was arranged for him by Washington Hospital Center, and a contract of employment was signed. The H1-B visa is essentially a work contract that was valid up until November 2004. Washington Hospital Center submitted a green card petition so Mr. Kassem could remain longer than permitted by the H1-B visa.

8.      The contract is silent as to term although the Sign-on Bonus Acknowledgement requires "[plaintiff Kassem] agreeing to remain in the employment of the Hospital Center in a qualifying position for a two-year minimum period."

9.      As required, plaintiff presented his credentials as a Nuclear Medicine Technologist, presented his NMTCB Certification and in all respects provided proof that he was fully qualified for his position. In fact, plaintiff has earned a Masters Degree in Health Science in Medical Radiation Science, one of a very limited number, and has had en excellent work record.

10.     Plaintiff became the second most senior technical officer in Nuclear Medicine Imaging at Washington Hospital Center and was responsible for factors affecting the overall quality of the service.

11.     During the entire period of his employment, plaintiff performed his duties

with distinction and received numerous commendations. He was so valued an employee that Washington Hospital Center sponsored him for a green card. After plaintiff took over the cardiac team the physicians and nursing staff commended him on the improved service provided by the Nuclear Cardiology team.

12.    The Nuclear Lab was an important part of the operation of the Washington Hospital Center. The Nuclear Lab performed all nuclear diagnostic activities, which were quite complex, difficult to perform, expensive and potentially dangerous; they required a highly regulated work environment—ultimately monitored by the Nuclear Regulatory Commission (hereinafter "NRC")—and well-educated, well-trained and responsible lab personnel and excellent administration.

13.    These standards are of particular importance in the Nuclear Lab because in addition to having responsibility for critical diagnostic tests on patients similar to that of other departments, the material is radioactive and potentially dangerous to the workers, the patients and, if the nuclear materials are not tightly controlled, may be removed from the lab and used to pose a danger to members of the general public outside Washington Hospital Center.

14.    During his period of employment, plaintiff observed numerous irregularities and improprieties in the conduct of the Nuclear Lab, which he brought to the attention of the administrators of the Lab and others at Washington Hospital Center. Administrators Wayne Dunkle and Dr. Van Nostrand discouraged plaintiff from bringing to their attention all of the perceived regulatory infractions.

15.    Plaintiff reported several infractions in the cardiac section of the Nuclear Lab, which was administered by Adrian Mishoe and Lawrence Dioh, but these reports

3

were ignored by Washington Hospital Center.

16.     A frequent infraction at the Nuclear Lab, which was reported by plaintiff, was that the evening technologist behaved unprofessionally toward patients and frequently arrived at work drunk and was permitted to treat patients.

17.     Another technologist frequently mishandled diagnostic procedures, abused patients verbally and produced low-quality diagnostic studies that were of little use to the medical staff, but plaintiff's reports were generally ignored.

18.     Plaintiff reported to the hospital administration that the Washington Hospital Center Nuclear Lab's computer network--the system that records or acquires nuclear diagnostic studies and transfers the studies to another computer from which the studies are reviewed—was frequently losing diagnostic studies and was unable to retrieve many studies performed.

19.     The Nuclear Lab had constant camera malfunctions and equipment failures, which were not corrected by the administration, which made self-monitoring of nuclear material less effective.

20.     Plaintiff questioned the poor documentation of emergency and on-call procedures and the lack of good safety and record-keeping practices.  Washington Hospital Center has been cited by the NRC for deficiencies in self-monitoring and record keeping.

21.     Plaintiff alerted the supervisors to poorly qualified personnel performing quality control on the Lab's imaging equipment, but which made the patient studies less reliable and accurate than had they been performed by qualified staff.

22.     In early 2003, the hot-lab door to the nuclear material storage room was

4

not kept secure at all times as was required by regulation, which gave anyone entering

that department access to a biologically hazardous quantity of radioactive material. This

was of especial concern because Washington Hospital Center is second only to

Massachusetts General Hospital in the number of Iodine therapy treatments given for

thyroid ablations, three of which treatments would amount to 1000 MBQ

(megabecquerels) of radiation--more than sufficient to make a moderate-sized dirty

bomb.

   23. On July 20, 2003, Nuclear Technician Dioh was injected with a diagnostic

dosage of technetium-99m without the knowledge and approval of a physician or

authorized user. Washington Hospital Center purported to investigate this serious NRC

violation, but lost valuable evidence, failed to validate the network to preserve its

information, accepted uncorroborated stories from favored persons, and failed to

investigate these violations diligently, as Washington Hospital Center had failed to

investigate diligently and report accurately other violations to the NRC.

   24. The Washington Hospital Center administration aimed its investigation a

placing all blame on plaintiff, who was particularly vulnerable since Washington Hospital

Center, as sponsor, controlled plaintiff's immigration status. Indeed, one of the members

of the investigative team told plaintiff that if the Washington Hospital Center could get

plaintiff to say "what they wanted to hear to make the investigation complete, then he

would be able to save his visa and his livelihood and wouldn't be kicked out of the

country." Recognizing that he himself as well as the Washington Hospital Center had a

duty to inform the NRC accurately of the violations, plaintiff declined to participate in

Washington Hospital Center's cover-up of its regulatory infractions and suffered the

consequences of his refusal: the termination of his employment.

25.    Washington Hospital Center furnished the results of its investigation to the NRC in order to get the NRC to discipline plaintiff and to prevent the NRC from examining Washington Hospital Center's violations.

26.    On August 15, 2003, Washington Hospital Center used its defective investigation result to terminate plaintiff's contract because he insisted that Washington Hospital Center should present a true and accurate account of the incident. On August 28, 2003, because his immigration visa was with drawn, plaintiff was required to leave the United States.

27.    On or about January 7, 2005, after a full investigation and hearing, the NRC dismissed the charges against plaintiff for insufficiency of evidence and initiated regulatory proceedings against Washington Hospital Center arising out of this matter.

28.    Plaintiff's wrongful discharge was predicated on the inaccurate factual presentation to the NRC by which Washington Hospital Center tried to cover up its NRC violations.

## Count 1
## Breach of Contract

29.    Plaintiff restates and incorporates by reference herein Paragraphs 1 through 28, above.

30.    On or about August 15, 2003, defendant Washington Hospital Center terminated from his employment contract.

31.    The termination was based on false accusations and a deficient investigation concerning the Dioh matter made by employees and officers of Washington Hospital Center.

32.    Washington Hospital Center failed to investigate these allegations competently and fairly.

33.    Many of the factual allegations against plaintiff Kassem were untrue and the conclusions were invalid.

34.    As a proximate result of the acts of Washington Hospital Center and its employees, plaintiff was terminated from his employment.

35.    Washington Hospital Center terminated plaintiff to prevent him from fulfilling his obligation to report accurately the facts of the Dioh violation to the NRC and to retaliate against him for his attempts to exercise his civil obligation to require Washington Hospital Center to report accurately its regulatory violations to the NRC and for his refusal to engage in illegal activity by agreeing to cover up Washington Hospital Center's gross mishandling of nuclear material and the incompetence of its employees and officers.

36.    Had Washington Hospital Center performed its investigation and arrived at its conclusions without covering up, misstating and misinterpreting facts, Washington Hospital Center would have been required to admit to the NRC that Washington Hospital Center and its staff, but not plaintiff, had, among other things, mishandled nuclear material and that some of the nuclear material that had come into the possession of Washington Hospital Center could not be accounted for. Such an admission would have resulted in disciplinary action against Washington Hospital Center, perhaps even the NRC's revocation of Washington Hospital Center's nuclear permit, which would have caused great economic harm to Washington Hospital Center.

37.    By improperly conducting its investigation into the Dioh incident and terminating plaintiff's employment to make it appear that the fault was plaintiff's rather than Washington Hospital Center's, Washington Hospital Center prevented or attempted to prevent the NRC, an agency of the United States government, from performing its supervisory functions with respect to nuclear material.

38.    Such termination constituted a wrongful termination of plaintiff's employment contract because plaintiff was discharged in retaliation for attempting to ensure compliance by the Washington Hospital Center with applicable NRC nuclear safety regulations.

39.    As a proximate result of Washington Hospital Center's wrongful termination of plaintiff's employment, plaintiff suffered the loss of salary and other economic harm, physical harm, emotional distress and plaintiff has been damaged in his name, reputation and professional standing.

WHEREFORE, plaintiff seeks judgment against defendant Washington Hospital Center for compensatory damages in the amount of one million dollars ($1,000,000) together with interest from the time of the occurrence to the date of judgment as well as punitive damages in the amount of one million dollars ($1,000,000), post-judgment interest, costs, attorneys fees and such other relief, as this Court deems appropriate.

### Count 2
### Intentional Infliction of Emotional Distress

40.    Plaintiff restates and incorporates by reference herein Paragraphs 1 through 39 above.

41.    On and after July 20, 2003, the Washington Hospital Center conducted an investigation into an incident occurring on July 20, 2003, in which Nuclear Technician Dioh was injected with a diagnostic dosage of technetium-99m without the knowledge and approval of a physician or authorized user.

42.    The Washington Hospital Center's investigation was aimed at placing blame for the incident on plaintiff and exonerating Washington Hospital Center. In the course of its investigation, Washington Hospital Center fabricated evidence, lost evidence that would have shown the truth of the matter, and put great pressure on plaintiff to participate in Washington Hospital Center's regulatory cover-up.

43.    Knowing that plaintiff took great pride in his professional conduct, Washington Hospital Center tried to pressure plaintiff into accepting blame when Washington Hospital Center knew or should have known plaintiff was not responsible for the violations.  Washington Hospital Center knew that plaintiff was especially susceptible to pressure from Washington Hospital Center because his staying in the United States was dependent on Washington Hospital Center's visa sponsorship and he was dependent on Washington Hospital Center for his livelihood and professional employment.

44.    Two of defendant's administrative investigators informed plaintiff that if he did not confess to inculpatory conduct he "would never work in this city again" and that plaintiff would be portrayed to prospective employers and colleagues in his field as being responsible for the nuclear material violations.  Plaintiff refused to accede to their demands.

45.    On or about August 15, 2003, plaintiff was discharged wrongfully by Washington Hospital Center based on the false and misleading evidence Washington

9

Hospital Center gathered in the investigation of the unauthorized use of radioactive material in the Dioh case.

46.     Because of the financial distress and the withdrawal of his visa caused by his wrongful discharge, plaintiff departed for Australia where he stayed until May 2004, when he returned to the United States.

47.     Defendant Washington Hospital Center intended to cause plaintiff such financial distress and deportation, among other things, to make plaintiff less available for truthful testimony to the NRC.

48.     On or about August 25, 2003, defendant Washington Hospital Center made false statements about plaintiff to the NRC with the intent of inducing the NRC to initiate disciplinary action against plaintiff.

49.     Organizations to which plaintiff applied for employment became aware of Washington Hospital Center's allegations against plaintiff demonstrating that they had been informed directly or indirectly by defendant Washington Hospital Center. As a result plaintiff was significantly damaged in seeking employment in his field of medical nuclear technology.

50.     Defendants' conduct was intentional and reckless and aimed at inducing the NRC to discipline plaintiff and leading persons in the nuclear technology profession to incorrectly consider plaintiff as unfit to practice so that he would be damaged in his professional activity.

51.     Defendant's conduct was intended to avoid NRC regulatory action against Washington Hospital Center, which might jeopardize Washington Hospital Center's use of nuclear diagnostic facilities, threaten its economic well-being, and expose its

10

deficiencies in handling nuclear materials, all of which would cause Washington Hospital Center significant financial loss in its highly profitable nuclear lab program.

52.    Defendant Washington Hospital Center's deliberate conduct caused plaintiff to face deportation, suffer economic loss, prevented him from practicing his profession successfully and caused him great mental distress

53.    Defendants' conduct was extreme and outrageous.

54.    Defendants' conduct caused plaintiff severe emotional distress and economic harm.

55.    As a proximate result of defendant Washington Hospital Center's conduct, plaintiff suffered severe emotional distress, was deprived of his property and livelihood, and sustained injuries, damages, and losses, including mental pain and suffering, shame, embarrassment and emotional distress and has been damaged in his name and reputation.

WHEREFORE, plaintiff seeks judgment against defendant Washington Hospital Center for compensatory damages in the amount of one million dollars ($1,000,000) and punitive damages in the amount of one million dollars ($1,000,000), together with interest from the time of the occurrence to the date of judgment as well as post-judgment interest, costs, attorneys fees and such other relief as this Court deems just and appropriate.

Respectfully submitted,

Brian W. Shaughnessy
DCB No. 89946
913 M Street, NW, Suite 101
Washington, DC 20001
(202) 842-1700

11

Attorney for Plaintiff
Fady Kassem

## **JURY TRIAL DEMAND**

A jury trial is demanded as to all counts of this complaint.

Brian W. Shaughnessy