IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FADY KASSEM**<br><br>　　　　　**Plaintiff,**<br><br>　　v.<br><br>**WASHINGTON HOSPITAL CENTER**<br><br>　　　　　**Defendant.** | **CASE NO.: 1:05-cv-02352**<br>**Judge Robertson** |

## OPPOSITION TO MOTION TO DISMISS

COMES NOW plaintiff Fady Kassem, by and through counsel, and opposes defendant Washington Hospital Center's Motion to Dismiss for the following reasons.

## STATEMENT OF FACTS

The complaint sets forth two valid claims for relief: a count for wrongful termination and a count for intentional infliction of emotional distress.

The wrongful termination count asserts that WHC entered into an employment contract with plaintiff by which he was sponsored for a visa, employed as a radiology technician, paid a regular salary, performed his job duties well and ultimately was wrongfully terminated. The wrongful termination was a result of his insistence that proper reports be filed with the NRC rather than the falsified report actually filed by WHC to retain its nuclear license and destroy plaintiff. Thus, plaintiff was wrongfully terminated because of his insistence on reporting WHC's misconduct to the regulatory agency.

As the lynchpin of its attack on the first count, defendant contends in its statement of facts that plaintiff was terminated when "he illegally injected another hospital employee with nuclear material" without a physician's approval.  First, this contention is untrue as is demonstrated by the NRC's rejection of WHC's claim that plaintiff was culpable. Second, and more significantly for defendant's motion, defendant has introduced a matter outside the pleading, which turns its motion under Rule 12(b) to dismiss for failure to state a claim into a motion for summary judgment, which requires disposition under Rule 56.  Defendant also relies on the District of Columbia employment at-will doctrine, but fails to consider the law in the District of Columbia regarding a public policy exception to that doctrine.  See, e.g., Adams v. George W. Cochran & Co., 597 A.2d 28, 30 (D.C. 1991).

In its attack on the count alleging the intentional infliction of emotional distress, defendant claims that its course of conduct in threatening plaintiff to get him to go along with WHC's fabrication of evidence in its obstruction of the Nuclear Regulatory Commission proceeding, deliberately pressuring plaintiff by threatening to use the fabricated evidence to take away his right to practice his chosen profession and then having him financially drained and deported to prevent him from defending himself before the NRC and exposing WHC obstruction and regulatory violations, who as an alien could be and was deported if WHC withdrew its support,  was just a "typical employer –employee conflict," and not outrageous conduct designed to cause plaintiff extreme emotional distress.  We doubt that targeting a vulnerable person such as plaintiff, depriving him of his long held dream of being a nuclear medical technologist, draining him financially, throwing him out of the country to prevent him from defending himself,

and perpetrating an obstruction of an NRC proceeding—many would regard this a criminal behavior—constitutes an acceptable norm of institutional behavior. One expects that any reasonable juror would proclaim such conduct outrageous.

## LEGAL STANDARD

When considering a Motion to Dismiss, the Court construes the facts in the complaint as true and construes all reasonable inferences in the light most favorable to the plaintiff. See Swierkiewicz v. Sorema, 534 U.S. 506, 508 (2002). A Motion to Dismiss is granted and the complaint dismissed only if no relief could be granted on those facts. See Sparrow v. United Air Lines Inc., 216 F.3d 1111, 1114 (D.C. Cir. 2002) (stating that complaints "need not plead law or match facts to every element of a legal theory") (quoting Krieger v. Fadely, 211 F.3d 134, 136 (D.C. Cir. 2000)).

A. **Breach of Contract and Wrongful Discharge**.

Count One sets forth the origin of plaintiff's employment relationship with WHC as a series of acts demonstrating that a contract of employment was entered into between the parties and that plaintiff was wrongfully discharged.[1] Because it claims that plaintiff's employment at WHC was "at-will" employment, defendant erroneously asserts that there was no contract of employment. In MacIntosh v. Building Owners, 355 F. Supp. 2d 223, 226 (D.D.C. 2005), cited in defendant's Motion, "At –will employment should not be viewed as the absence of a contract, but as a species of contract, "a principle well-settled" in the District of Columbia. Sheppard v. Dickstein, 59 F. Supp. 2d 27, 32 (D.D.C. 1999)." Under District of Columbia law, "the mutual promise to employ and serve creates a

---

[1] Although labeled as a Breach of Contract, the count states a claim for wrongful discharge. See complaint, ¶¶34, 35, 37, 38, and 39

3

contract terminable 'at will' by either party." Bell v. Ivory, 966 F. Supp. 23, 29 (D.D.C. 1997)(citing Sullivan v. Heritage Found., 399 A.2d 856 (D.C. 1979)).

Nonetheless, defendant's essential contention remains that even if there was contract, WHC was entitled to terminate plaintiff pursuant to the District of Columbia "at-will" employment doctrine under the circumstances presented by the instant complaint. This is not so

The essence of the at-will doctrine is "an employer may discharge an at-will employee at any time and for any reason, or for no reason at all." Adams v. George W. Cochran & Co., 597 A.2d 28, 30 (D.C. 1991). However, the Adams court created an exception under which a discharged at-will employee may sue his or her former employer for wrongful discharge when the sole reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation.

In recent years, as the courts have developed the "emerging doctrinal basis for the public policy exception," Martin Marietta Corp. v. Lorenz, 823 P.2d 100, 113 (Colo. 1992), the at-will doctrine has been "undergoing considerable erosion." Boudar v. Buenette, 106 N.M. 279, 742 P.2d 491, 494 (1987) (en banc). That exception has been explicated by the DC Court of Appeals, which has adopted this more restricted application of the bar of the at-will doctrine.

In Washington v. Guest Services, Inc., 718 A.2d 1071 (D.C.1998), plaintiff had alleged that she was discharged in retaliation for attempting to ensure compliance by a fellow employee with District of Columbia health and food regulations. In response to the question of whether that allegation was sufficient to preclude entry of summary judgment against her, the Court found that that allegation constituted a valid public policy

4

exception to the at-will doctrine. The Court reasoned, "The "public policy" exception to the at-will doctrine had been widely applied in other jurisdictions to categories of conduct similar to that in which Ms. Washington claims to have engaged. See generally 82 AM.JUR.2D Wrongful Discharge § 15, at 688 (1992) (explaining that "the courts generally protect three categories of protected employee conduct: (1) exercising a statutory right or civil obligation; (2) refusing to engage in illegal activity; [and] (3) reporting criminal conduct to supervisors or outside agencies")." Mr. Kassem's behavior in complaining repeatedly about WHC's flouting of the NRC regulations and seeking to have such regulations observed by WHC is well within the parameters found actionable in all three categories protected in Washington.

The facts here demonstrate that WHC's conduct of its Nuclear Medicine Department was subject to statutes and regulations under the administration of the Nuclear Regulatory Commission, in particular 10 CFR §35.27, 10 CFR §30.10(a)(1) and Condition 11 of the NRC license, and that Mr. Kassem had become aware of and reported a number of violations of regulatory procedure to WHC. The precipitating incident for Mr. Kassem's wrongful discharge involved his attempt comply with those regulations and others, refusing to engage in WHC's illegal activity and attempting to report the violations to the NRC.

As a result of Mr. Kassem's earlier reports of violations to Dunkle and Van Nostrand, the administrators of the WHC Nuclear Medicine Department, Mr. Kassem never became a fully accepted member of that department although he was respected for his technical competence,. When the regulatory violation occurred—the Dioh test, which was impossible for WHC to ignore—the investigation was entrusted to insiders in the

Department, evidence was lost, destroyed or suppressed and WHC discharged Mr. Kassem, turned him over to the NRC for prosecution on incomplete and fraudulent evidence, and helped cause his deportation, making it more difficult for him to vindicate his rights.  Because Mr. Kassem refused to go along with WHC's frequent and flagrant— not to say dangerous—violations of the NRC regulations, WHC discharged him. Accordingly, it seems incontrovertible on the actual facts of this case, not those compiled by WHC in its attempt to avoid discipline by the NRC, that Mr. Kassem's contractual claim is not defeated by the District of Columbia's at-will doctrine. See Washington v. Guest Services, Inc. at 718 A.2d 1071.

Because, if it were proven that the Dioh injection was without the approval of a physician, this would be a violation of United States Nuclear Regulatory Commission regulations, the Washington Hospital Center attempted to minimize its violations by wrongfully accusing Mr. Kassem of being a participant in the violation and, thereafter, terminating his employment.   Because of these accusations, Mr. Kassem was required to face charges of regulatory violations by the Nuclear Regulatory Commission.  After a full investigation and hearing, Mr. Kassem was cleared of these charges, and the Nuclear Regulatory Commission is pursuing an inquiry into both the Washington Hospital Center and Nuclear Technician Dioh.

In light of plaintiff's observations about WHC's lax conduct in operating its Nuclear Medicine Department and plaintiff's attempt to provide accurate information about the Dioh incident, it is plain that WHC sought to cover up its nuclear malfeasance by terminate plaintiff's employment so that WHC's license to operate its Nuclear Medicine Department, a major profit center for WHC, would not be jeopardized.  Thus, it

is evident that there were powerful public policy reasons to find that WHC wrongfully discharged plaintiff in violation of the Adams-Washington exceptions to the at-will doctrine. Indeed, plaintiff's position is supported by the case primarily relied on by defendant, MacIntosh v. Building Owners, supra which denied defendant's motion to dismiss the wrongful discharge count under even less egregious circumstances than are found here.

Since the at-will employment doctrine in the District of Columbia permits a claim for wrongful discharge under circumstances where plaintiff, as here, is vindicating a public policy and falls within the Adams-Washington exceptions, the Motion to Dismiss should be denied.

### B. Intentional Infliction of Emotional Distress

To establish a prima facie case of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress. Howard Univ. v. Best, 484 A.2d 958, 985 (D.C. 1984) (quoting Sere v. Group Hospitalization, Inc., 443 A.2d 33, 37 (D.C. 1982. Relying on Thompson and Kerrigan, defendant claims that because the instant case involves a former employee of defendant and this is merely a "typical employer-employee conflict," outrageousness should not be found. An extensive and comprehensive articulation of the outrageousness standard was set forth in Homan v. Goyal, 711 A.2d 812, 818 (D.C. 1998):

> [t]he requirement of outrageousness is not an easy one to meet." Id. at 1312 (citations omitted). Liability will not be imposed for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Waldon, supra, 415 A.2d at 1076 (citations omitted); see also Sterling Mirror of Md., Inc. v. Gordon, 619 A.2d 64, 67 (D.C. 1993). "Against a large part of the frictions and irritations and clashing of temperaments incident to

> participation in a community life, a certain toughness of the mental hide is a better protection than the law could ever be." W. PAGE KEETON, PROSSER & KEETON ON TORTS § 12, at 56 (5th ed. 1984) (quoting Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 HARV.L.REV. 1033, 1035 (1936)). Generally, a case of intentional infliction of emotional distress is made out only if "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" RESTATEMENT, supra, § 46 comment d. Homan v. Goyal, 711 A.2d at 818.

Here, defendant's conduct goes well beyond the relatively mundane behavior in Thompson and Kerrigan. Plaintiff Kassem is a well-educated young man trained and certified as a Nuclear Medicine Technologist with a great desire to excel and advance in his chosen profession. After being sponsored for a visa to this country by WHC, Mr. Kassem was employed as a Nuclear Medicine Technologist for two years, and he advanced to the second most senior technical officer in officer in Nuclear Medicine Imaging at Washington Hospital Center and was responsible for factors affecting the overall quality of the service. The Nuclear Lab was an important part of the operation of the Washington Hospital Center. The Nuclear Lab performed all nuclear diagnostic activities, which were quite complex, difficult to perform, expensive and potentially dangerous; they required a highly regulated work environment—ultimately monitored by the Nuclear Regulatory Commission (hereinafter "NRC")—and qualified, responsible professionals. The Nuclear Medicine Department was an important profit center and prestigious part of the WHC, and any questions about its management and care in the conduct of its nuclear testing activity would jeopardize its reputation and financial well-being.

During his tenure at WHC, plaintiff a highly responsible technologist brought many regulatory infractions and misconduct to the attention of his superiors, including

Dr. Van Nostrand and Mr. Dunkle, so that the WHC could rectify these problems as a responsible user of radioactive material is required to do, both by the NRC and responsible medical behavior. WHC Administrators Van Nostrand and Dunkle discouraged Mr. Kassem from bringing these regulatory infractions to their attention. Some of these infractions were mishandling of diagnostic procedures, lost reports, a drunken technologist being permitted to conduct tests, equipment malfunctions, poor documentation and lack of good safety procedures for which for deficiencies in self-monitoring and record keeping for which WHC had been cited by the NRC. Indeed, in early 2003, plaintiff reported that the hot-lab door to the nuclear material storage room was not kept secure at all times as was required by regulation, which gave anyone entering that department access to a biologically hazardous quantity of radioactive material. This was of especial concern to plaintiff because WHC stores much nuclear material and the lab should be secure because among other things, there was sufficient radioactive material in the hot lab to make a moderate-sized dirty bomb if obtained by people so inclined. Thus, plaintiff was seen by WHC as an overly conscientious employee who posed a threat from whom the WHC would need to protect itself.

On July 20, 2003, a nuclear technician was injected with a diagnostic dosage of technetium-99m without the knowledge and approval of a physician or authorized user. Washington Hospital Center purported to investigate this serious NRC violation, but lost or destroyed valuable evidence, failed to validate the network to preserve its information, accepted uncorroborated stories from favored persons, and failed to investigate these violations diligently, as Washington Hospital Center had failed to investigate diligently and report accurately other violations to the NRC.

The Washington Hospital Center administration aimed its investigation at placing all blame on plaintiff, who was particularly vulnerable since Washington Hospital Center, as sponsor, controlled plaintiff's immigration status. Indeed, one of the members of the investigative team told plaintiff that if the Washington Hospital Center could get plaintiff to say "what they wanted to hear to make the investigation complete, then he would be able to save his visa and his livelihood and wouldn't be kicked out of the country." As a threat to secure compliance with the WHC party line, administrator Dunkle gave plaintiff a copy of a decision of the NRC in which the NRC barred a hospital employee from prohibiting the employee from participating in any NRC-licensed activities for a period of five years. See NRC Ruling 1A-01-023- Paige Rowland, April 2, 2001. If plaintiff would not participate in the WHC obstruction—which may very well be a criminal offense—plaintiff would face a similar punishment because the WHC would and did fabricate the incriminating evidence and prevent him from defending himself by having him deported.

Recognizing that he himself as well as the Washington Hospital Center had a duty to inform the NRC accurately of the violations, plaintiff declined to participate in Washington Hospital Center's cover-up of its regulatory infractions and suffered the consequences of his refusal: the termination of his employment and his deportation to Australia. The WHC carried or tried to carry out its threat to have the NRC bar him from his profession by furnishing the results of its investigation to the NRC in order to get the NRC to discipline plaintiff and to prevent the NRC from examining Washington Hospital Center's violations[2], knowing full well and intending that the NRC would, if it believed

---

[2] WHC's foul scheme to scapegoat plaintiff has been thwarted, however. Plaintiff returned to this country last year and went to a hearing on WHC's charges before the NRC. The NRC conducted a further

10

WHC's false evidence, take away plaintiff's ability to practice his profession for at least five years—effectively removing him permanently from nuclear technology. Not only did the Washington Hospital Center use its fabricated investigation result to terminate plaintiff's employment WHC caused his immigration visa to be withdrawn requiring him to leave the United States within two weeks so he could not defend himself from it foul tactics.

After plaintiff was terminated, WHC continued to deprive him of his opportunities to obtain a job in his chosen field. Because of WHC's actions plaintiff could not get a job in nuclear technology, could not get references. The actions of the WHC severely soured and destroyed the plaintiff's ability to gain to obtain the type of position he aspired to in his chosen profession, namely a position in an educational institution or university hospital both of which required the plaintiff to produce a thorough and honest employment history—impossible after WHC's deliberate destruction of his career. His experience with the WHC would most certainly cast a shadow over his once promising chances of gaining a directorial or program educator class position. Thus, the educational advantage that plaintiff possessed over his peers was nullified and made useless by WHC's outrageous conduct.

Beyond that plaintiff suffered shame and ignominy in the eyes of his peers, friends, and family. After WHC deliberately caused plaintiff to be thrown out of this country, he had to go back to his homeland. There the once proud parents of an aspiring scientist were brought to substantial distress, disbelief and humiliation at the very thought of their son having been discharged and deported after his and their once bright hopes

---

investigation, plaintiff was exonerated, and the NRC has commenced administrative proceedings against WHC and the nuclear technologists. Nonetheless, plaintiff has been delayed in pursuing his profession by at least three years and may still have a cloud over his professional activities.

were dashed by the WHC scheme.

Plaintiff had dreamed of practicing in the field of nuclear technology since high school and was deprived of his goal because he was vulnerable as an alien dependent on WHC's continued visa support. WHC deliberately selected plaintiff as the scapegoat for its severe regulatory violations, because he was seem as disloyal and troublesome and unwilling to participate in WHC's obstruction of the NRC's regulatory process and WHC knew that he was vulnerable and had little financial and professional support outside of his job. The scheme was perpetrated because WHC knew it was necessary for the WHC to protect its lucrative profit center because a regulatory violation might shut down the WHC nuclear lab.

WHC picked out plaintiff because he was isolated, was troublesome to WHC's financial well-being[3], and was highly vulnerable to pressure, which they deliberately enhanced by showing what WHC could cause the NRC to do to plaintiff—at least a five year license revocation, practically a permanent bar because of the closed nuclear technology community and deportation. These threats, fabricated evidence and the difficulty of defending himself must constitute outrageous conduct intended to cause him emotional distress. It strains credulity to characterize WHC's conduct as "typical employer-employee conflict." The fabricated investigation, the false report to the NRC, the threat of professional sanctions and the financial and social pressure WHC brought to bear on plaintiff caused him severe emotional distress. Any reasonable juror hearing how WHC deliberately sacrificed Mr. Kassem on the altar of WHC's reputation in the medical community and financial gain must cry "Outrageous."

---

[3] Because plaintiff was highly qualified in his field he posed an especial threat to WHC because he could detect what WHC was doing and would be credible to any investigating authority.

12

This deliberate attack upon plaintiff in his professional capacity was outrageous and well within the bounds of <u>Homan</u> and other cases treating the tort of intentional infliction of emotional distress.

Accordingly we request that WHC's motion to dismiss be denied.

WHEREFORE, plaintiff requests that the Court deny defendant's Motion to Dismiss.

Respectfully submitted,

_____
Brian W. Shaughnessy, DCN 89946
913 M Street, NW, Suite 101
Washington, DC  20001
(202) 842-1700

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FADY KASSEM**<br><br>           **Plaintiff,**<br>**v.**<br><br>**WASHINGTON**<br><br>**HOSPITAL CENTER**<br><br>           **Defendant.** | **CASE NO.: 1:05-cv-02352**<br>**Judge Robertson** |

## **ORDER**

Upon consideration of defendant's Motion to Dismiss and plaintiff's Opposition thereto, and the entire record, it is hereby

ORDERED, this ___ day of February 2006, that defendants' Motion to Dismiss is DENIED.

 

_____
JUDGE

Copies to:

Daniel M. Creekman
KING PAGANO HARRISON
1730 Pennsylvania Ave., N.W., Suite 900
Washington, D.C. 20006

Brian W. Shaughnessy
913 M Street, N.W., Suite 101
Washington, D.C. 20001