IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FADY KASSEM**<br><br>　　　　　**Plaintiff,**<br>　v.<br><br>**WASHINGTON HOSPITAL CENTER**<br><br>　　　　　**Defendant.** | **CASE NO.: 1:05-cv-02352**<br>**Judge Robertson** |

## SURREPLY

COMES NOW plaintiff Fady Kassem, by and through counsel, and surreplies to defendant Washington Hospital Center's Reply for the following reasons.

**1.** **Plaintiff was Wrongfully Discharged by the Washington Hospital Center**

The complaint sets forth two valid claims for relief: a count for wrongful termination and a count for intentional infliction of emotional distress.  Under District of Columbia law, "the mutual promise to employ and serve creates a contract terminable 'at will' by either party." Bell v. Ivory, 966 F. Supp. 23, 29 (D.D.C. 1997)(citing Sullivan v. Heritage Found., 399 A.2d 856 (D.C. 1979)). As is plain, defendant promised to employ plaintiff, made arrangements to bring him into the United States, employed him and paid him.  Plaintiff agreed to be employed, was employed for a period of two years and was paid for his employment at Washington Hospital Center.  This constitutes employment.  And plaintiff was wrongfully discharged from that employment.

**2.     The Public Policy Exception to the At-Will Doctrine Applies.**

Defendant claims that plaintiff is not entitled to invoke the District of Columbia public policy exception to the "at-will" employment doctrine. Defendant asserts that because a remedy is suggested in the Energy Reorganization Act (hereinafter "ERA"), 42 USC §5801, et seq., plaintiff is required to seek that remedy. This contention is not so.

In pertinent part, 42 USC §5851(a) provides as follows:

(1) No employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to a request of the employee)—
(A) notified his employer of an alleged violation of this chapter or the Atomic Energy Act of 1954 (42 U.S.C. 2011, et seq.);
(B) refused to engage in any practice made unlawful by this chapter or the Atomic Energy Act of 1954, if the employee has identified the alleged illegality to the employer;
(C) testified before Congress or at any Federal or State proceeding regarding any provision (or proposed provision) of this chapter or the Atomic Energy Act of 1954;
(D) commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this chapter or the Atomic Energy Act of 1954, as amended, or a proceeding for the administration or enforcement of any requirement imposed under this chapter or the Atomic Energy Act of 1954, as amended;
(E) testified or is about to testify in any such proceeding or;
(F) assisted or participated or is about to assist or participate in any manner in such a proceeding or in any other manner in such a proceeding or in any other action to carry out the purposes of this chapter or the Atomic Energy Act of 1954, as amended.

Defendant's Reply relies on § 42 USC §5851(a)(1)(A)-(B), apparently claiming that WHC wrongfully discharged plaintiff for having a) notified WHC of an alleged violation of the Energy Reorganization Act (hereinafter "ERA") or b) refused to engage in a practice made unlawful by the NRC

In fact, defendant WHC claimed that it had discharged plaintiff after its investigation demonstrated he had wrongfully injected Technician Dioh with nuclear

material. There is no allegation that plaintiff had notified the NRC of the violation nor that he had refused to engage in an unlawful practice before his being wrongfully discharged. Plaintiff simply told the truth to the WHC investigators. WHC selected plaintiff as the scapegoat because plaintiff had made previous observations about WHC's lax conduct in operating its Nuclear Medicine Department, had provided accurate information to WHC about the Dioh incident, and because of his training was dangerous to WHC's profits. Plaintiff's contributions of information to WHC's investigation were rejected, and plaintiff was fired because WHP did not want to provide truthful information to the NRC and needed a scapegoat to avert sanctions affecting its nuclear medicine department. Thus, although WHC's scapegoating of plaintiff arose out of WHC's fear of potential NRC sanctions, plaintiff's wrongful discharge itself was to enable WHC to evade those sanctions, not because plaintiff actually performed a specific action set forth in § 42 USC §5851(a)(1)(A)-(B). Thus, although plaintiff was discharged because a fair investigation of the Dioh incident would have required WHC to be honest with the NRC and admit its violations of public policy, plaintiff himself did not perform the specific acts[1] enumerated above. Accordingly, plaintiff's wrongful discharge is not barred by the application of §42 USC §5851(a).

Even if some of these specific actions may be found to have occurred, plaintiff is not barred from pursuing an unlawful discharge remedy in this Court pursuant to the specific language of §5851 (h):

---

[1] An additional basis for plaintiff's invocation of the public policy exception is that Washington Hospital Center's actions may constitute the obstruction of an agency proceeding punishable as a crime. This public policy exception is not found in ERA, but at 18 U.S.C. §1505

3

**Nonpreemption**
This section may not be construed to expand, diminish, or otherwise affect any right otherwise available to an employee under Federal or State law to redress the employee's discharge or other discriminatory action taken by the employer against the employee.

In Nolting v. National Capital Group, 621 A.2d 1387 (DC App.1993) relied on by defendant, the D.C. Court of Appeals considered a public policy exception wrongful discharge suit involving the District of Columbia's Workers' Compensation Act, D.C. Code §§ 36-301 to -345 (1988). The Court of Appeals noted that

This section also contains a specific remedy for any such unlawful retaliatory action. The prescribed remedy subjects an employer who violates this section to "a penalty of not less than $100 or more than $1,000," and further provides that the employee "so discriminated against shall be restored to his employment and shall be compensated by his employer for any loss of wages arising out of such discrimination." D.C. Code § 36-342. The Act does not refer to any other remedies. 621 A.2d at 1389.

Finding the Workers' Compensation Act to provide the exclusive remedy for its violation, the court upheld the dismissal of the Nolting complaint[2] on that ground. In the instant case, the language permitting an employee to bring an action, not at the NRC, but at the Labor Department, specifically permits a a person to assert his rights in state or federal court. Accordingly, the Nolting analysis does not apply as may be seen by the language quoted above.

Defendant also suggests that dicta in Nolting bars the complaint here. The dicta was that "we do not think [the public policy exception] can be invoked where the very

---

[2] Dicta in Nolting suggested that "we do not think [the public policy exception] can be invoked where the very statute creating the relied-upon public policy already contains a specific and significant remedy for the party aggrieved by its violation." 621 A.2d at 1389. In recent years, as the courts have developed the "emerging doctrinal basis for the public policy exception," Martin Marietta Corp. v. Lorenz, 823 P.2d 100, 113 (Colo. 1992), the at-will doctrine has been "undergoing considerable erosion." Boudar v. Buenette, 106 N.M. 279, 742 P.2d 491, 494 (1987) (en banc). See Washington v. Guest Services, Inc., 718 A.2d 1071 (D.C.1998), We submit that a likely less restrictive reading than the dicta in Nolting would except plaintiff from the at-will, wrongful discharge limitation.

4

statute creating the relied-upon public policy already contains a specific and significant remedy for the party aggrieved by its violation." 621 A.2d at 1390.  First, the ERA, unlike the DC Workers' Compensation Act, does not contain the remedy, but refers an employee out to another agency to conduct a hearing and, because the NRC is still conducting an investigation into the Washington Hospital Center, it is not clear that the Department of Labor (DOL) would have access to all of the investigative data compiled or to be compiled by the NRC.  Since we expect that there will be further information generated by the NRC that will not be available to the DOL because of privacy concerns, investigative and enforcement requirements that might be accommodated if the remedy were found in the NRC, not the DOL.  Accordingly, the DOL procedure permitted, but not required by §5851--unlike the DC Workmen's Compensation Act in Nolting, which contains the policy and the remedy--does not necessarily provide full remedies to plaintiff here, even if plaintiff's actions are covered by §5851.

Therefore, the possible remedy at the DOL suggested, but not required in 42 U.S.C. §5851 does not preclude plaintiff's invoking the public policy exception for his wrongful discharge claim here.

### 3.     A Claim for Intentional Infliction of Emotional Distress was Stated.

As in its Motion, defendant argues that because its intentional infliction of emotional distress was in part related to their employment relationship, defendant WHC had a free fire zone to attack plaintiff.  Defendant, again citing to Thompson v. Jasas Corp. 212 F. Supp. 2d 21 (DDC 2002) and Kerrigan v. Britches of Georgetown, Inc. 705 A. 2d 624 (DC App. 1997), claims that defendant's actions amounted a normal employer-employee conflict that was mundane.

Although plaintiff does not dispute that facts in Thompson and Kerrigan may be mundane, a apt application of the standard is found in Larijani v. Georgetown University, 791 A.2d 41 (DC App. 2002). Larijani, also arising out of an employment relationship, reversed summary judgment where the complaint alleged the employer had set up a noisemaker to bother the employee over a nine-month period. Although skeptical of the incident, the court recognized that the behavior alleged could be found by the jurors to have been outrageous as required by the District of Columbia's emotional distress standard.

An extensive and comprehensive articulation of the outrageousness standard was set forth in Homan v. Goyal, 711 A.2d 812, 818 (D.C. 1998):

> [t]he requirement of outrageousness is not an easy one to meet." Id. at 1312 (citations omitted). Liability will not be imposed for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Waldon, supra, 415 A.2d at 1076 (citations omitted); see also Sterling Mirror of Md., Inc. v. Gordon, 619 A.2d 64, 67 (D.C. 1993). "Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughness of the mental hide is a better protection than the law could ever be." W. PAGE KEETON, PROSSER & KEETON ON TORTS § 12, at 56 (5th ed. 1984) (quoting Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 HARV.L.REV. 1033, 1035 (1936)). Generally, a case of intentional infliction of emotional distress is made out only if "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" RESTATEMENT, supra, § 46 comment d. Homan v. Goyal, 711 A.2d at 818.

Here, defendant's conduct goes well beyond the relatively mundane behavior and limited duration of the infliction in Thompson and Kerrigan, and even beyond the nine month period of that in Larijani . A review of the allegations, which will be supported by substantial evidence, demonstrates that WHC's behavior was not only outrageous, but also extended well beyond the workplace for a period of about three years.

6

Plaintiff Kassem, as was known to WHC, is a well-educated young man trained and certified as a Nuclear Medicine Technologist with a great desire to excel and advance in his chosen profession. After being sponsored for a visa to this country by WHC, Mr. Kassem had advanced to the second most senior technical officer in officer in Nuclear Medicine Imaging at Washington Hospital Center and was responsible for factors affecting the overall quality of the service.

The Washington Hospital Center administration aimed its investigation of the Dioh incident at placing all blame on plaintiff, who was particularly vulnerable since theWashington Hospital Center, as sponsor, controlled plaintiff's immigration status. Indeed, one of the members of the investigative team told plaintiff that if the Washington Hospital Center could get plaintiff to say "what they wanted to hear to make the investigation complete, then he would be able to save his visa and his livelihood and wouldn't be kicked out of the country." As a threat to secure compliance with the WHC party line, administrator Dunkle gave plaintiff a copy of a decision of the NRC in which the NRC barred a hospital employee from prohibiting the employee from participating in any NRC-licensed activities for a period of five years. See NRC Ruling 1A-01-023-Paige Rowland, April 2, 2001. If plaintiff would not participate in the WHC obstruction—which may very well be a criminal offense—plaintiff would face a similar punishment because the WHC would and did fabricate the incriminating evidence and prevent him from defending himself by having him deported.

Plaintiff suffered the consequences: among other things, the termination of his employment, the loss of a contract on a house, his deportation to Australia, and a continuing attack on his ability to practice his profession. The WHC continued, even after

7

discharging plaintiff, to act on its threat to have the NRC bar him from his profession by furnishing the results of its investigation to the NRC in order to get the NRC to discipline plaintiff and to prevent the NRC from examining Washington Hospital Center's violations[3], knowing full well and intending that the NRC would, if it believed WHC's false evidence, take away plaintiff's ability to practice his profession for at least five years—effectively removing him permanently from nuclear technology. Not only did the Washington Hospital Center use its fabricated investigation result to terminate plaintiff's employment, WHC caused his immigration visa to be withdrawn requiring him to leave the United States within two weeks so he could not defend himself from it foul tactics.

After plaintiff was terminated, WHC continued to deprive him of his opportunities to obtain a job in his chosen field. Because of WHC's actions plaintiff could not get a job in nuclear technology, could not get references. The actions of the WHC severely soured and destroyed the plaintiff's ability to gain to obtain the type of position he aspired to in his chosen profession, namely a position in an educational institution or university hospital both of which required the plaintiff to produce a thorough and honest employment history—impossible after WHC's deliberate destruction of his career. WHC's deliberate and continuing actions most certainly cast a shadow over plaintiff's once promising chances of gaining a directorial or program educator class position. Thus, the educational advantage that plaintiff possessed over his peers was nullified and made useless by WHC's outrageous conduct.

Beyond that plaintiff suffered shame and ignominy in the eyes of his peers,

---

[3] The intended effect of WHC's foul scheme to scapegoat plaintiff has been partly averted. Plaintiff returned to this country last year and went to a hearing on WHC's charges before the NRC. The NRC conducted a further investigation, plaintiff was exonerated, and the NRC has commenced administrative proceedings against WHC and the nuclear technologists. Nonetheless, plaintiff has been delayed in pursuing his profession by at least three years and still has a cloud over his professional activities.

friends, and family. After WHC deliberately caused plaintiff to be thrown out of this country, he had to go back to his homeland. There the once proud parents of an aspiring scientist were brought to substantial distress, disbelief and humiliation at the very thought of their son having been discharged and deported after his and their once bright hopes were dashed by the WHC scheme.

Plaintiff had dreamed of practicing in the field of nuclear technology since high school and was deprived of his goal because he was vulnerable as an alien dependent on WHC's continued visa support. WHC deliberately selected plaintiff because he was isolated, was troublesome to WHC's financial well-being[4], and was highly vulnerable to pressure, which they deliberately enhanced by showing what WHC could cause the NRC to do to plaintiff—at least a five year license revocation, practically a permanent bar because of the nature of the closed nuclear technology community and deportation. These threats, the fabricated evidence, the continuing attacks on his professional career, and WHC's erection of barriers to plaintiff's ability to defend himself must constitute outrageous conduct intended to cause him emotional distress. It strains credulity to characterize WHC's conduct as "typical employer-employee conflict." The fabricated investigation, the false report to the NRC, the threat of professional sanctions and the financial and social pressure WHC brought to bear on plaintiff caused him severe emotional distress. Any reasonable juror hearing how WHC deliberately sacrificed Mr. Kassem on the altar of WHC's reputation in the medical community and financial gain must cry "Outrageous."

---

[4] Because plaintiff was highly qualified in his field he posed an especial threat to WHC because he could detect what WHC was doing and would be credible to any investigating authority. It was not sufficient to discharge plaintiff, but the Washington Hospital Center saw the need to destroy him.

WHEREFORE, plaintiff requests that the Court deny defendant's Motion to Dismiss.

Respectfully submitted,

_____
Brian W. Shaughnessy, DCN 89946
913 M Street, NW, Suite 101
Washington, DC  20001
(202) 842-1700

Attorney for Plaintiff
Fady Kassem